IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| YOUSIFEH BASSIL and ANTOINE BASSIL, husband and wife, <br><br> Plaintiffs, <br><br> v. <br><br> STARWOOD HOTELS AND RESORTS WORLDWIDE, INC., WESTIN HOTEL MANAGEMENT, L.P., COLUMBIA SUSSEX CORPORATION, and GALLEON BEACH RESORT, LTD., <br><br> Defendants. | CIVIL ACTION <br> NO. 12-4204 |

## MEMORANDUM OPINION

**Schmehl, J.**                                                                 **September 24, 2014**

Before the Court is the Second Motion of Defendant, Galleon Beach Resort, Ltd., to Dismiss Plaintiffs' Amended Complaint (Docket No. 41). Plaintiffs, Yousifeh Bassil and Antoine Bassil ("Plaintiffs") have opposed the motion, Defendant has filed a reply, and Plaintiffs have filed a sur-reply letter. Having read the parties' briefing, I will deny Defendants' Motion to Dismiss and order this matter to proceed to arbitration.

### I.   BACKGROUND

This matter arises from an incident which occurred on July 25, 2010 when Plaintiffs were vacationing in the Cayman Islands. (Amended Complaint, ¶ 11.) On this date, Plaintiff-wife allegedly was injured when she tripped and fell while staying at the Westin Casuarina Resort and Spa ("Resort"), located in Grand Cayman, Cayman Islands. (Id.) In her fall, Plantiff-wife suffered a torn rotator cuff and two fractured ribs. (Id. at ¶ 14.)

Plaintiffs originally sued Columbia Sussex Corporation, Starwood Hotels and Resorts Worldwide, Inc. and Westin Hotel Management, L.P. in this court. Upon learning that none of these defendants owned or operated the hotel where Plaintiff-wife fell, Plaintiffs were permitted to amend their complaint to name Galleon Beach Resort, Ltd. ("Galleon"), the owner of the hotel, as a defendant.

Galleon filed a Motion to Dismiss, alleging that this Court cannot exercise personal jurisdiction over it, as it has no contacts with Pennsylvania. The Honorable Cynthia M. Rufe denied Defendants' Motion to Dismiss without prejudice, and permitted the parties to engage in jurisdictional discovery in order to determine if jurisdiction over Galleon can be imputed to it based upon the theory of alter ego jurisdiction. After this matter was transferred to the undersigned and jurisdictional discovery was completed, Defendants filed their second Motion to Dismiss. Defendants again argue that this Court has no personal jurisdiction over Galleon as Galleon is not owned, operated or controlled by any of the other defendants and therefore, there is no alter ego jurisdiction over Galleon.

## II.   DISCUSSION

Defendants move to dismiss Plaintiffs' claims on the basis of lack of personal jurisdiction. In response, Plaintiffs argue that this Court has general jurisdiction over Defendant Galleon Beach Resort Ltd. through an alter ego theory of personal jurisdiction. Specifically, Plaintiffs argue that Galleon is the alter ego of Columbia Sussex Corporation ("CSC"), a company over which this Court does have jurisdiction.[1]

---

[1] Plaintiffs do not allege that this Court has specific jurisdiction over Galleon, nor do they argue that Galleon had sufficient minimum contacts with Pennsylvania so as to subject it to this Court's general jurisdiction. Plaintiffs' sole argument as to jurisdiction is that Galleon is the alter ego of CSC and therefore, jurisdiction over CSC can be imputed to Galleon.

Therefore, Plaintiffs urge that because this Court has jurisdiction over CSC, this Court also has jurisdiction over Galleon as a related corporation. For the reasons that follow, I find that this Court has jurisdiction over Defendant Galleon. Accordingly, I will deny Defendants' Motion to Dismiss.

### A. Legal Standard

A motion to dismiss for lack of jurisdiction is brought under Federal Rule of Civil Procedure 12(b)(2). The standard for deciding a motion under Rule 12(b)(2) is different from that governing a Rule 12(b)(6) motion. While a 12(b)(6) motion requires a court to accept the allegations of the non-moving party as true, a 12(b)(2) motion "requires resolution of factual issues outside the pleadings, i.e., whether in personam jurisdiction actually lies." Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n. 9 (3d Cir. 1984). Once the defendant raises the issue of lack of personal jurisdiction, the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence. The plaintiff may not rely on the pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. Id.

### B. Alter Ego Jurisdiction

The alter ego theory of jurisdiction can be used to impute a corporation's contacts with a forum to a related corporation for purposes of establishing personal jurisdiction. See Lucas v. Gulf & Western Industries, Inc., 666 F.2d 800, 805-06 (3d Cir. 1981) (abrogated on other grounds by EF Operating Corp. v. American Bldgs., 993 F.2d 1046, 1049 )(3d Cir. 1993)). To establish personal jurisdiction under the alter ego theory, a plaintiff must show something more than simply a parent-subsidiary relationship. See

3

Lucas, 666 F.2d at 805-06. Rather, "the alter ego test looks to whether the degree of control exercised by the parent is greater than normally associated with common ownership and directorship and whether the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent." In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation, 735 F.Supp.2d 277, 319 (W.D. Pa. 2010) (internal citations omitted).

Courts examine ten factors when analyzing the relationship between related corporations under the alter ego theory, including 1) ownership of all or most of the stock of the related corporation; 2) common officers and directors; 3) common marketing image; 4) common use of a trademark or logo; 5) common use of employees; 6) integrated sales system; 7) interchange of managerial and supervisory personnel; 8) performance by the related corporation of business functions which the principal corporation would normally conduct through its own agent or departments; 9) acting of the related corporation as marketing arm of the principal corporation, or as an exclusive distributor; and 10) receipt by the officers of the related corporation of instruction from the principal corporation. In re Latex Gloves Products Liability Litig., MDL No. 1148, 2001 WL 964105 (Ludwig, J.) (E.D. Pa. Aug. 22, 2001). "No one aspect of the relationship between two corporations unilaterally disposes of the analysis, and the court may consider any evidence bearing on the corporations' functional interrelationship." In re Chocolate Confectionary Antitrust Litigation, 674 F.Supp.2d 580, 598 (M.D. Pa. 2009).

After careful examination of the relevant factors and the facts presented by Plaintiffs, I find that Plaintiffs have properly established that CSC and Galleon are

4

sufficiently inter-related so as to permit the exercise of alter ego jurisdiction. I will analyze the factors identified in Latex Gloves below.[2]

### 1. Ownership of Galleon stock

CSC does not own any stock in Galleon. William J. Yung, President and Director of both CSC and Galleon, testified that CSC never owned Galleon. (Docket no. 41, Ex. I, p. 57.) Further, Theodore R. Mitchel, an officer in both CSC and Galleon, testified that all shares in Galleon are owned by Casuarinas Cayman Holdings. Further, Mr. Mitchel testified that Galleon Development Corporation is the sole shareholder in Casuarinas Cayman Holdings. (Docket No. 41, Ex. J., pp. 9-13.) In turn, the William J. Yung Family Trust is the sole owner of all non-common shares of Galleon Development Corporation, while William J. Yung personally owns all common shares in Galleon Development Corporation. (Id. at p. 13.) Mr. Mitchel further testified that CSC has never owned any stock in Galleon Beach Resort. (Id. at p. 70.)

Plaintiffs argue that William J. Yung controls both CSC and Galleon, and therefore the corporations should be considered to have common ownership, but Plaintiff has presented no evidence that Yung or CSC own any stock in Galleon. Plaintiffs' allegations that Yung controls both corporations are insufficient to prove common

---

[2] Defendants argue that the concept of alter ego jurisdiction is limited to corporations that have a parent-subsidiary relationship, and that because CSC and Galleon are not parent/subsidiary, alter ego jurisdiction cannot apply to Galleon in this matter. This contention is incorrect. It is true that a parent-subsidiary relationship is the type of corporate structure most often seen in the context of alter ego jurisdiction. However, courts in this circuit have on occasion found that alter ego jurisdiction can apply to related corporations not in a parent-subsidiary style relationship. See Superior Coal Co. v Ruhrkohle, A.G., 83 F.R.D. 414, 421 (E.D. Pa. 1979) (stating that a corporation may transact business in a district through related corporations and that in scrutinizing the relationship between the related corporations in order to determine if exercise of the court's jurisdiction is proper, the "substance, not form, of the inter-corporate nexus will be dispositive"); Gregoire v. Schleicher & Co. Intern., A.G., No. 90-4720, 1991 WL 168644 (E.D. Pa. Aug. 21, 1991)(Buckwalter, J.) (stating that a court may obtain jurisdiction over a nonresident corporation through its ties to a "related, resident corporation" by performing "unremitting scrutiny into the relationship between the two entities" in which the "substance, not the form, of the inter-corporate nexus will be dispositive").

ownership. Therefore, I find this factor weighs against the finding of an alter ego relationship between the two corporations.

### 2. Common Officers and Directors

It is undisputed that CSC and Galleon had (and continue to have) significant overlap in their officers and directors. At the time of the incident in question, the two corporations had five common officers and directors, and at the present time, they have two common officers and directors. (Docket No. 42, Ex. G, pp. 2-3.) I find that this factor weighs in favor of the existence of an alter ego relationship between CSC and Galleon.

### 3. Common Marketing Image

Plaintiffs argue that CSC and Galleon share a common marketing image and that, "in the public sphere, Galleon has been subsumed by [CSC]." (See Plaintiffs' Brief in Opposition to Mtn to Dismiss, unnumbered p. 7)  In support of this contention, Plaintiffs submit print-outs from various websites that they claim prove that CSC "marketed itself as the force behind the Resort." (Id.)  Plaintiffs include the following examples from the internet:  1) a print out from CSC's employment website that directs job-seekers to the Resort to fax their resume to CSC and states that the Resort is "Managed by [CSC]" (Docket No. 42, Ex. N); 2) a page out of the American Hotel & Lodging Association's Directory that lists the Resort as one of CSC's "international properties" (Docket No. 42, Ex. O); 3) a 2002 press release which states that "The Westin Casuarina Resort and Spa is owned and operated by [CSC]" (Docket No. 42, Ex. P); 4) an article found in the periodical *Daily Report* that states "[CSC's] Westin Casaurina Resort & Spa in the Cayman Islands may face foreclosure after demand slumped and the borrower said it can't cover debt payment shortfalls" (Docket No. 42, Ex. Q);  and 5) an article on Travel

Weekly's website that states "The [Resort] faced foreclosure when former owner [CSC] was unable to cover debt payments." (Docket No. 42, Ex. R.)

Defendants fail to address the articles and websites discussed above, aside from alleging that they are not "competent evidence" that this Court can consider in ruling on Defendants' Motion to Dismiss. I find that information such as that produced by Plaintiffs is indeed competent evidence that can be used at this stage of proceedings to defeat Defendants' motion to dismiss. At a bare minimum, these sources show that on occasion, CSC held itself out to the public and marketed itself as the owner and/or operator of the Resort. I find that this factor weighs in favor of finding an alter ego relationship between CSC and Galleon.

### 4. Common Use of Trademark or Logo

Plaintiffs argue that CSC and Galleon both take advantage of the trademark "Westin." Plaintiffs have provided evidence that the Westin logo is displayed throughout the Resort and that the Resort uses the Westin corporate logo. Further, Plaintiffs argue that Resort's promotional materials show only the Westin name and do not reference Galleon at all.

In response, Defendants argue that Galleon contracted with Westin License Company for use of Westin logos and trademarks and therefore had every right to use Westin logos and trademarks in its business. (Def's Reply Brief, p. 6). I agree with Defendants and find that the mere use of the Westin logo does not weigh in favor of an alter ego relationship existing between CSC and Galleon. It cannot be disputed that multiple hotels have contracted with Westin License to use the Westin logo; obviously,

the mere creation of such a contract does not result in any sort of relationship with Galleon.

### 5. Common Use of Employees/Interchange of Managerial and Supervisory Personnel

Plaintiffs claim that CSC and Galleon are "so enmeshed with one another that the Defendants are confused about exactly who works for each company." (Pl's Brief in Opposition, unnumbered p. 9.) In support of this contention, Plaintiffs point to employees Roberta Bush, Daniel Szydlowski, Sharon Raehring, Poppy Guloien and Daniel Beddor. As to Ms. Bush, Defendants state that she is an employee of Galleon but Plaintiffs claim that she is held out to the public as an "agent of the Westin Casuarina Resort & Spa" in promotional materials which show the Westin Grand Cayman Sales Team and list Ms. Bush as the Sales Coordinator. (Docket No. 42, Ex. T.) Plaintiffs also argue that Ms. Bush accepted service of the amended complaint and signed for it on behalf of "Galleon Beach Resort Ltd. The Westin." (Docket No. 42, Ex. W.) As to Mr. Szydlowski, Defendants represent that he was employed as general manager of **Galleon** from 2001 to 2011, but Plaintiffs cite to Mr. Szydlowski's Linked In profile, which states that he has been employed by **CSC** from 2001 to present. (Docket No. 42, Ex. H.) Plaintiffs also take issue with Sharon Raehring, an employee of CSC from 1997 to the present, according to Defendants, because her business card shows that she is Director of Group Sales for The Westin Casuarina Resort & Spa, with a Sales Office located at CSC's corporate address. (Docket No. 42, Ex. I.) Lastly, Plaintiffs allege that Daniel Beddor, who came to Plaintiff-wife's aid at the time of her fall, provided her with a business card that stated he was Director of Rooms at "The Westin Casuarina Resort & Spa," and that he sent

8

Plaintiffs an email indicating he was Director of Rooms at the Westin Casuarina Resort & Spa.

In response, Defendants argue that Szydlowski and Fulioen are both employees of Galleon, not CSC, and that Raehring, although not employed by Galleon, is also **not** employed by CSC. Rather, Raehring is employed by Columbia Sussex Management, LLC. (Docket No. 43, Ex. H-2.) Further, although Plaintiffs argue that Ms. Bush was employed by both CSC and Galleon, the only evidence shows that Bush was in fact employed by Galleon from 2007 to 2011. (Docket No. 43, Ex. H-2, no. 19.) I find that Plaintiffs have failed to present competent evidence that there was an intermingling of personnel between Galleon and CSC. Clearly, employees who worked at the Resort used the Westin logo on business cards, etc., but the mere use of a logo is not proof that employees were common to both corporations.  Therefore, I find this factor weighs against an alter ego relationship between the two corporations.

**6.  Integrated Sales System**

Plaintiffs argue that CSC and Galleon employ an integrated sales system based on the fact that Sharon Raehring, Director of Group Sales, works from the sales office at CSC's corporate address, while her business card shows that her territory includes the Resort. (Docket No. 42, Ex. I.) Plaintiffs also rely on the fact that Sales Coordinator Roberta Bush was employed by Galleon but listed on the Westin website as Sales Coordinator for the Westin Grand Cayman Sales Team and reported to Szydlowski, who Plaintiffs claim is the general manager of CSC.[3] (Docket No. 42, Exs. G, no. 19 and T.)

---

[3] Other than Mr. Szydlowski's LinkedIn profile, Plaintiffs have produced no other evidence to support their contention that Mr. Szydlowski is employed by CSC,

9

I find that Plaintiffs have failed to present sufficient competent evidence of an integrated sales system. The mere fact that Director of Group Sales Sharon Raehring, an employee of Columbia Sussex Management, LLC, worked at CSC's offices and also handled sales for the Resort is not, without more, sufficient evidence to prove an integrated sales system. Therefore, this factor weighs against the finding of an alter ego relationship.

### 7. Performance of Business Functions which the Corporation would Normally Conduct through its own Agent or Departments

As to this factor, Plaintiffs point to a 1996 "Service Agreement" that Galleon and CSC entered into, whereby Galleon contracted with CSC for CSC to provide "accounting and business management services on its behalf." (Docket No. 42, Ex. J.) These services would also include administrative tasks, filing forms with governmental agencies, insurance matters, processing invoices and payments and obtaining and renewing licenses. (Id., see also, Docket No. 43, Ex. J, pp. 30-31, 47.) In exchange for providing these services, CSC would be paid $5,000 per month. (Id.) Plaintiffs also point out the page from the CSC website where Resort job-seekers are directed to fax their resumes to CSC and not Galleon. (Docket No. 42, Ex. N.) Lastly, Plaintiffs focus on a $140 million loan Galleon received from Wachovia which was guaranteed by CSC and a $400,000 loan which was made from CSC to Galleon for operating expenses. (Docket No. 42, Exs. C, pp. 19-20 and F, p. 29.) Plaintiffs argue that CSC not only guaranteed the $140 million loan, but it "orchestrated procurement of the loan." In support of this contention, Plaintiffs reference an email chain in which officers and directors of CSC are discussing the loan to be obtained by Galleon. (Docket No. 42, Ex. K.)

I find that the Services Agreement, the $140 million loan to Galleon guaranteed by CSC and the $400,000 loan by CSC to Galleon for its operating expenses all clearly weigh in favor of an alter ego relationship between these two corporations. I am also persuaded by the fact that Galleon has received mail at CSC's mailing address in Kentucky, in care of CSC (Docket No. 42, Ex. C, pp. 42-43), had letterhead which displayed Galleon's address as being CSC's address in Kentucky (Id., Ex. D), and wrote checks which show Galleon's address to be CSC's address in Kentucky. (Id., Ex. E.) Defendants argue that Galleon's mailing address is in fact in Grand Cayman, and that "Galleon could receive mail at CSC's place of business" pursuant to the Services Agreement entered into between CSC and Galleon. I find it to be telling that Galleon chose to use CSC's address in Kentucky as its mailing address and that CSC permitted this use to occur. This is very significant evidence of the existence of an alter ego relationship between the two corporations.

### 8. Acting of Related Corporation as Marketing Arm or Exclusive Distributor of Other Corporation

Plaintiffs set forth no argument on this factor.

### 9. Receipt by Officers of the Related Corporation of Instruction from the Other Corporation

In regards to this factor, Plaintiffs state that CSC "manager's manual was provided to Galleon as a reference for management" of the Resort. (Docket No. 42, Ex. G, No. 24.) Further, when the Resort developed financial troubles, CSC led a "Transition Planning Meeting" to discuss the issues and all of the individuals present at that meeting were CSC officers; no Galleon officers were present. (Docket No. 42, Ex. M.)

Defendants do not refute these contentions. I find that this is again a significant factor that weighs in favor of an alter ego relationship between the two corporations.

The weighing of the above factors by mere numbers seems to present a very close call as to whether CSC and Galleon are sufficiently interconnected as to give this court jurisdiction over Galleon, a corporation that admittedly has no contacts with this forum. However, Plaintiffs point to a number of significant business factors which suggest a high degree of intimacy and communality between the two entities. I find that the more important factors clearly weigh in favor of finding an alter ego relationship in this case. Plaintiffs have presented sufficient evidence from which an inference can be drawn that the two corporations do not deal with each other as separate legal entities. See Componetone, L.L.C. v. Componentart, Inc., No. 05-1122, 2007 WL 776930 (W.D. Pa. 2007) (McVerry, J.). Plaintiffs' evidence certainly leads to the inference that CSC controls the day-to-day operations of Galleon. Therefore, I find that both corporations are sufficiently inter-related so as to allow alter ego jurisdiction to exist as to Galleon Beach Resort Ltd. Accordingly, Defendants' Motion to Dismiss is denied.

### III.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is denied.